IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| EAGLE VIEW TECHNOLOGIES, INC., and PICTOMETRY INTERNATIONAL CORP. | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | C.A. No. 21-1852-RGA |
| ROOFR INC., | ) ) | |
| Defendant. | ) ) | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Karen E. Keller (No. 4489)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
kkeller@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Plaintiffs Eagle View Technologies, Inc. and Pictometry International Corp.*

OF COUNSEL:
L. Kieran Kieckhefer
SHEARMAN & STERLING LLP
535 Mission Street, 25th Floor
San Francisco, CA 94105
(415) 616-1100

Matthew G. Berkowitz
Patrick Colsher
Yue (Joy) Wang
SHEARMAN & STERLING LLP
1460 El Camino Real, 2nd Floor
Menlo Park, CA 94025
(650) 838-3600

Dated: May 27, 2022

**Table of Contents**

I.      INTRODUCTION ..................................................................................................1

II.     NATURE AND STAGE OF PROCEEDINGS ....................................................2

III.    SUMMARY OF ARGUMENT ...........................................................................3

IV.     STATEMENT OF FACTS ..................................................................................4

        A.      EagleView Revolutionized The Industry With Innovative Roof Reports And
                Received Patents For The Novel, Specific Inventions It Pioneered. ......................4

        B.      EagleView's Family Of Roof Report And Roof Measurement Patents Have
                Already Been Found Valid After Multiple Section 101 Challenges. .....................5

V.      LEGAL STANDARD ..........................................................................................7

VI.     ARGUMENT .......................................................................................................8

        A.      The '800 Patent Claims Eligible Subject Matter. ..................................................8

                1.      The '800 Patent Is Not Directed To An Abstract Idea..............................11

                2.      The '800 Patent Recites An Inventive Concept. ........................................14

        B.      The '538 Patent Claims Eligible Subject Matter ................................................15

                1.      The '538 Patent Is Not Directed To An Abstract Idea..............................16

                2.      The '538 Patent Recites An Inventive Concept ........................................18

        C.      The '840 Patent Claims Eligible Subject Matter ................................................19

                1.      The '840 Patent Is Not Directed To An Abstract Idea..............................20

                2.      The '840 Patent Recites An Inventive Concept ........................................22

        D.      Roofr Has Not Met Its Burden To Show The Claims Are Representative ...........22

        E.      Roofr's Motion Is Also Premature ......................................................................24

VII.    CONCLUSION...................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Aatrix Software, Inc. v. Green Shades Software, Inc.*,
    882 F.3d 1121 (Fed. Cir. 2018)...............................................................................3, 8, 15, 24

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
    573 U.S. 208 (2014) ................................................................................................ *passim*

*Bascom Glob. Internet Servs. v. AT&T Mobility*,
    827 F.3d 1341 (Fed. Cir. 2016)...............................................................................7, 20, 24

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007) ..................................................................................................7

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018)...............................................................................8, 15

*Blackbird Tech LLC v. Niantic, Inc.*,
    2018 WL 5630452 (D. Del. Oct. 31, 2018) ...........................................................12

*CardioNet, LLC v. InfoBionic, Inc.*,
    955 F.3d 1358 (Fed. Cir. 2020)...............................................................................16, 19

*CertusView Techs., LLC v. S&N Locating Servs. LLC*,
    111 F. Supp. 3d 688 (E.D. Va. 2015) .....................................................................14

*Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*,
    880 F.3d 1356 (Fed. Cir. 2018)...............................................................................20

*CosmoKey Sol'ns GmbH & Co. KG v. Duo Sec. LLC*,
    15 F.4th 1091 (Fed. Cir. 2021) ...............................................................................14, 18, 19

*DDR Holdings, LLC v. Hotels.Com L.P.*,
    773 F.3d 1245 (Fed. Cir. 2014)............................................................................... *passim*

*Diamond v. Diehr*,
    450 U.S. 175 (1981).................................................................................................12, 18

*Eagle View Technologies, Inc. v. GAF Materials, LLC*,
    Case No. 2:22-cv-00215 (D. Utah) .........................................................................21

*Eagle View Techs. v. Xactware Sol'ns.*,
    358 F. Supp. 3d 399 (D.N.J. 2019) .........................................................................6, 17

*EagleView Tech., Inc. v. Xactware Sol'ns., Inc.*,
    485 F. Supp. 3d 505 (D.N.J. 2020) ............................................................ *passim*

*EagleView Techs, Inc. v. Nearmap US, Inc.*,
    Case No. 2:21-cv-283-TS-DAO, 2021 WL 5299729 (D. Utah Nov. 15, 2021) ...............1, 6, 7

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016) .............................................................................8

*Int'l Bus. Machines Corp. v. Zillow Grp., Inc.*,
    549 F. Supp. 3d 1247 (W.D. Wash. 2021) ............................................................13

*Koninklijke KPN N.V. v. Gemalto M2M GmbH*,
    942 F.3d 1143 (Fed. Cir. 2019) .............................................................................8

*McRO, Inc. v. Bandai Namco Games Am., Inc.*,
    837 F.3d 1299 (Fed. Cir. 2016) .......................................................................... *passim*

*Move, Inc. v. Real Estate All. Ltd.*,
    721 F. App'x 950 (Fed. Cir. 2018) .....................................................................13

*Pragmatus Telecom v. Genesis Telecomms.*,
    114 F. Supp. 3d 192 (D. Del. 2015) ...............................................................3, 22

*Promos Techs., Inc. v. Samsung Elecs. Co. Ltd.*,
    No. 18-307-RGA, 2018 WL 5630585 (D. Del. Oct. 31, 2018) .............................................23

*TaKaDu Ltd. v. Innovyze, Inc.*,
    No. 21-291-RGA, U.S. Dist. LEXIS 40614 (D. Del. Mar. 8, 2022) .......................................18

*Thales Visionix Inc. v. United States*,
    850 F.3d at 1349 ......................................................................................18

*Trading Techs. Int'l v. IBG LLC*,
    921 F.3d 1084 (Fed. Cir. 2019) ...........................................................................13

*Ultramercial, Inc. v. Hulu, LLC*,
    722 F.3d 1335 (Fed. Cir. 2013) ...........................................................................7

*Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*,
    887 F.3d 1117 (Fed. Cir. 2018) .............................................................................8

## Statutes and Rules

35 U.S.C. § 101 ..........................................................................................*passim*

35 U.S.C. § 282(a) ..............................................................................................7

Fed. R. Civ. P. 12(b)(6) ..................................................................................*passim*

Plaintiffs Eagle View Technologies, Inc. ("Eagle View Techs.") and Pictometry International Corp. ("Pictometry", collectively with Eagle View Techs., "EagleView") hereby respond to Defendant Roofr Inc.'s ("Roofr" or "Defendant") Motion to Dismiss.

## I.   INTRODUCTION

This is now the sixth dispositive motion filed by a defendant under Section 101[1] against EagleView's portfolio of roofing technology patents.  Of the four prior such motions that have been decided thus far, ***all four*** have been denied in their entirety.  In particular, the asserted '840 Patent[2] has survived three successive challenges before two judges in the District of New Jersey. The asserted '800 Patent is an indirect continuation of U.S. Patent No. 8,542,880, which also survived a Section 101 challenge in the District of New Jersey.

Moreover, all of the patents in EagleView's battle-tested portfolio stem from fundamental improvements to roofing technology that revolutionized the market and industry.  EagleView was the first to use computers to "perform a distinct process" (specific techniques for estimating roof measurements using images) to achieve "a task previously performed by humans" (physically visiting and climbing onto a roof to measure it), resulting in patent-eligible inventions.  *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016) (finding computer-based 3-D animation technique patent eligible).   Roofr's motion should be denied.

Despite being aware of multiple prior decisions upholding EagleView's patents, which includes a decision[3] finding *McRO* "analogous" to EagleView's inventions, Roofr's brief does not

---

[1] All references to "Section 101" refer to 35 U.S.C. § 101.

[2] The asserted patents are U.S. Patent Nos. 8,170,840 (the "'840 Patent"), 9,183,538 (the "'538 Patent"), and 10,648,800 (the "'800 Patent").

[3] *EagleView Techs, Inc. v. Nearmap US, Inc.*, Case No. 2:21-cv-283-TS-DAO, 2021 WL 5299729, at *4-5 (D. Utah Nov. 15, 2021).

even mention *McRO*, much less analyze it given the patent-eligible inventions at hand.  Nor does Roofr meaningfully address the New Jersey decisions or explain why the result should be any different here, particularly as to the '840 Patent.  Instead, Roofr merely repeats the same oversimplifications of the asserted patents into alleged abstract ideas like "estimating a roofing area using an image of a roof" that prior courts have already rejected.  *E.g.*, *EagleView Tech., Inc. v. Xactware Sol'ns., Inc.*, 485 F. Supp. 3d 505, 518 (D.N.J. 2020) ("*Xactware II*") (rejecting argument that the asserted claims "are directed to the 'abstract ideas of photogrammetry—*i.e.*, calculating measurements from photos using well-known mathematical principles'").  Roofr's flawed analysis fails to meet its burden to show unpatentability.

In addition, Roofr fails to show that the handful of claims it addresses are representative of the asserted patents' other claims, which recite additional features and inventive concepts.  Roofr also glosses over factual disputes that render its motion premature at the pleadings stage.  For example, Roofr ignores that EagleView's inventions were novel and revolutionary, as recognized by the industry, as **found** by other Courts, and as set forth in the First Amended Complaint.  At the very least, those facts—which are taken as true on a motion to dismiss—preclude finding at *Alice* Step Two that the claims are merely conventional and lack an inventive concept.

Roofr's motion should be denied in its entirety.

## II.    NATURE AND STAGE OF PROCEEDINGS

This is a patent infringement action filed on December 29, 2021.  D.I. 1.  On April 1, 2022, EagleView filed a First Amended Complaint—the operative complaint—which asserts 3 patents.  D.I. 12 ("FAC").  On May 6, 2022, Roofr moved to dismiss on grounds that the asserted patents are directed to abstract ideas and are not patent eligible under Section 101.  D.I. 20.

### III.    SUMMARY OF ARGUMENT

1.      Roofr fails to meet its high burden of showing that the asserted patents are patent ineligible under Section 101 pursuant to the two-step test set forth in *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208 (2014).

2.      Roofr also fails to show that there are no relevant factual disputes such that these issues can be addressed at the pleading stage.  *See Aatrix Software, Inc. v. Green Shades Software, Inc.*, 882 F.3d 1121, 1125 (Fed. Cir. 2018) ("[P]atent eligibility can be determined at the Rule 12(b)(6) stage . . . only when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law.").

3.      Under *Alice* Step One, the claims are not directed to an abstract idea.  For example, the claims instead "focus on a specific means or method that improves the relevant technology."  *McRO*, 837 F.3d at 1314; *see also Xactware II*, 485 F. Supp. 3d at 518 (citing *McRO* to find that defendants' decision to oversimplify the patent claims and "ignore the claim language" was "fatal to their § 101 challenge" of, *inter alia*, the '840 Patent).

4.      Under *Alice* Step Two, the claims recite inventive concepts.  For example, and per the factual allegations in EagleView's Amended Complaint (which must be taken as true), the claims recite "specific" and unconventional techniques and "do not attempt to preempt every application of the [alleged abstract] idea."  *DDR Holdings, LLC v. Hotels.Com L.P.*, 773 F.3d 1245, 1259 (Fed. Cir. 2014); *see also Alice*, 573 U.S. at 225 (asking whether claims simply recite "well-understood, routine, conventional activit[ies]").

5.      The handful of claims that Roofr addresses are not representative of the other claims in the asserted patents, which are independently patentable under *Alice*.  *See Pragmatus*

*Telecom v. Genesis Telecomms.*, 114 F. Supp. 3d 192, 199-200 (D. Del. 2015) (putting the burden on defendants to show that the identified claims are representative).

## IV.     STATEMENT OF FACTS

### A.     EagleView Revolutionized The Industry With Innovative Roof Reports And Received Patents For The Novel, Specific Inventions It Pioneered.

As set forth in the specifications of the asserted patents, prior to EagleView's inventions, roofing contractors preparing an estimate for homeowners were forced to physically visit a house and climb on the roof to take measurements. *E.g.*, '538 Pat., 1:11-26; '840 Pat., 1:25-34; '800 Pat., 1:24-32. EagleView's inventions, developed over the course of more than a decade, established an entirely new alternative to manual measurements by creating accurate 3D roof models and generating detailed roof reports that are used in multiple industries, including construction, insurance, and solar. FAC ¶¶ 2, 6. This was not as simple as just using existing satellite images, which are often inaccurately geo-coded or suffer from other flaws that prevented them from being simple substitutes for manual processes. EagleView invented brand-new, technologically innovative ways to create an entirely new process and field of remote roof measurement—aspects of which it claimed in the asserted patents—that continue to be incredibly important today.

For example, the '800 Patent claims an improved process for generating a roof report that allows a user to correct the inaccurate designation of a target roof location in an aerial image retrieved from an aerial image database, thus enabling the use of databases, such as Google Earth, that are incorrectly geo-coded. FAC ¶ 26; *e.g.*, '800 Pat., Cl. 1. The '538 Patent claims the specific technique of using a "predominant pitch" to generate a roof report for determining the amount of material needed for a roof construction project. FAC ¶ 24; *e.g.*, '538 Pat., Cl. 14. The '840 Patent claims a "pitch determination marker," which is a unique computer-implemented tool that

functions to facilitate the transformation of a 2-dimensional aerial image into a 3-dimensional rendering of a roof.  FAC ¶ 23; *e.g.*, '840 Pat., Cl. 1.

Praise for EagleView's patented innovations has been immense.  As alleged in the FAC, news outlets noted that "EagleView made one of the biggest breakthroughs in the history of the industry by creating a state-of-the-art software program that remotely snaps sophisticated aerial pictures of roofs and accurately measures lengths, pitches, valleys and other hard-to-see areas on roofs."  FAC ¶ 21.  EagleView's competitors even admitted that EagleView's technology was "cutting edge," "very accurate," "innovative," "a breakthrough," and was unlike "anything that [previously] emerged as possible."  *Id.* ¶ 19 (citing *Xactware II*, 485 F. Supp. 3d at 511).  After a multi-week trial, a federal court in the District of New Jersey concluded that "[t]he evidence at trial revealed that EagleView's patented technology revolutionized the roofing industry" and "obviated the need for manual measurements of roofs with a tape measure in order to estimate the cost of repairing a roof."  *Id.* ¶ 18 (citing *Xactware II*, 485 F. Supp. 3d at 511).  The court noted that EagleView's patented technology had "at least three clear advantages": (1) improved safety, (2) decreased measurement time, and (3) increased accuracy.  *Id.*  Roofr describes its own product as "innovative" precisely because of the technology that EagleView first developed and the advantages EagleView's technology achieves: "[Roofr's] ***innovative tools*** enable roofers to generate ***accurate*** roof measurement reports and estimates for roofing projects, all ***within minutes*** and ***without the need to conduct a physical site visit***."  Mot. at 2 (emphasis added).

### B.   EagleView's Family Of Roof Report And Roof Measurement Patents Have Already Been Found Valid After Multiple Section 101 Challenges.

In 2019, after a multi-week trial before Judge Bumb in the District of New Jersey, a jury found EagleView's five asserted patents—including the '840 Patent—valid and infringed by

EagleView's competitors Xactware and Verisk.[4]   In confirming the ruling and denying those

defendants' post-trial motions, Judge Bumb denied all of the challenges to "EagleView's

resounding trial victory—from Defendants' [S]ection 101 challenge all the way through damages."

*Xactware II*, 485 F. Supp. 3d at 537.   With respect to Section 101, Judge Bumb found that the

asserted claims in *Xactware* each "requires specific, tangible images as inputs and generates

tangible roof-estimate reports as outputs[, and] requires modifying a model of the roof based on

specific adjustments to claimed markers on the 2D roof images."   *Id.* at 517.   Judge Bumb

repeatedly stated, "There is nothing abstract about this."   *Id.* at 517-18.   The previous presiding

judge, Judge Kugler, similarly found in denying summary judgment that "the asserted claims are

directed to an improvement in the functioning of a computer.   They solve the specific problem of

generating a roof repair estimate without direct human measurement of a roof."   *Eagle View Techs.*

*v. Xactware Sol'ns.*, 358 F. Supp. 3d 399, 409 (D.N.J. 2019) ("*Xactware I*").   Both judges found

it unnecessary to proceed to *Alice* Step Two.   *Xactware II*, 485 F. Supp. 3d at 518-19; *Xactware I*,

358 F. Supp. 3d at 409.[5]

More recently, a court in the District of Utah also denied a motion to dismiss directed at

two of EagleView's patents (the defendant in that case did not challenge the other six asserted

patents on Section 101 grounds).   *Nearmap*, 2021 WL 5299729.   The defendant in *Nearmap*,

similar to Roofr here, argued that certain of EagleView's patents were "directed to abstract ideas

---

[4] The '840 Patent also survived Xactware's petition for *inter partes* review by the Patent Trial
and Appeals Board.  *Xactware v. Eagle View Techns., Inc.*, No. IPR-2016-00586, Paper No. 15
(P.T.A.B. Aug. 16, 2016), *reh'g denied Xactware v. Eagle View Techs., Inc.*, No. IPR-2016-
00586, Paper No. 18 (P.T.A.B. Nov. 2, 2016).

[5] Judge Kugler also denied a motion to dismiss on Section 101 grounds directed at, *inter alia*, the
'840 Patent asserted here and the '800 Patent's indirect parent, U.S. Patent No. 8,542,880. *View
Techs., Inc. v. Xactware Sol'ns., Inc.*, Case No. 1:15-cv-07025, D.I. 104 (D.N.J. Aug. 2, 2016) (Ex.
A).

such as 'collecting and analyzing information,' 'overlaying a roof outline onto aerial images,' 'determining roof measurement information,' 'collect[ing] and present[ing] information based on the outline of the shape of a roof,' 'gathering information about buildings from aerial images,' and registering points on images to three-dimensional grids." *Id.* at *3. The court disagreed, finding "[t]he representative claims recite specific computerized steps using specific inputs and outputs to achieve specific goals in roof modeling technology." *Id.* at *4. The court further found that, "[a]s in *McRO*, EagleView claims distinct processes that are entirely different from the methods humans previously used to model or measure roofs by hand." *Id.* Like the New Jersey court, the Utah court also did not find it necessary to reach *Alice* Step Two. *Id.* at *5.

## V.     LEGAL STANDARD

When reviewing a Rule 12(b)(6) motion to dismiss, the Court must accept the complaint's factual allegations as true. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the plaintiff, the Court concludes that those allegations "could not raise a claim of entitlement to relief." *Id.* at 558.

A patent shall be presumed valid absent clear and convincing evidence to the contrary. *See* 35 U.S.C. § 282(a); *Ultramercial, Inc. v. Hulu, LLC*, 722 F.3d 1335, 1338 (Fed. Cir. 2013). "The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity." 35 U.S.C. § 282(a). The Section 101 inquiry involves "a two-step analytical framework to identify patents that, in essence, claim nothing more than abstract ideas." *Bascom Glob. Internet Servs. v. AT&T Mobility*, 827 F.3d 1341, 1347 (Fed. Cir. 2016). In Step One, the Court determines whether claims are directed to an abstract idea; if they are not, the claims are patent eligible. *See Alice*, 573 U.S. at 217. In Step One, the Court must determine what the claims

are "directed to" while being "careful to avoid oversimplifying the claims" and not "merely identify[ing] a patent-ineligible concept underlying the claim." *McRO*, 837 F.3d at 1313; *Vanda Pharm. Inc. v. West-Ward Pharm. Int'l Ltd.*, 887 F.3d 1117, 1134 (Fed. Cir. 2018). This requires reading the claims "in light of the specification," not in isolation. *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335 (Fed. Cir. 2016). Only if the Court determines that the claims are directed to an abstract idea does the analysis proceed to Step Two, which asks whether the claims include an inventive concept that transforms the abstract idea into a "patent-eligible application." *Id.* at 1334.

Patent claims directed to "non-abstract improvements to existing technological processes and computer technology," or "distinct process[es] to automate a task previously performed by humans" are patent eligible. *Koninklijke KPN N.V. v. Gemalto M2M GmbH*, 942 F.3d 1143, 1149-50 (Fed. Cir. 2019); *McRO*, 837 F.3d at 1313-14. "[W]hether a claim recites patent eligible subject matter is a question of law which may contain underlying facts." *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368 (Fed. Cir. 2018). For example, at *Alice* Step Two, "whether a claim element or combination of elements is well-understood, routine and conventional to a skilled artisan in the relevant field is a question of fact" that "must be proven by clear and convincing evidence." *Id.* A patent may be determined ineligible at the Rule 12(b)(6) stage only "when there are no factual allegations that, taken as true, prevent resolving the eligibility question as a matter of law." *Aatrix*, 882 F.3d at 1125.

## VI.   ARGUMENT

### A.   The '800 Patent Claims Eligible Subject Matter.

The '800 Patent, which issued long after *Alice* was decided, claims a solution necessarily rooted in computer technology to overcome a problem specifically arising in the field of digital imagery analysis for roof measuring—the type of innovation that the Federal Circuit has found to be non-abstract. *See, e.g.*, *McRO*, 837 F.3d at 1316; *DDR*, 773 F.3d at 1258-59. Specifically, the

8

'800 Patent claims a specific technique for identifying the roof of a building in an image for the purpose of determining the attributes of said roof, which is important in generating a roof report for estimating and bidding roofing jobs.  '800 Patent, 1:19-27; FAC ¶ 26.

The '800 Patent explains that measuring a roof using aerial imagery requires retrieving an image of the roof, for example from internet-based imagery databases such as Google® Earth. '800 Patent., 3:46-48, 5:43-45, 10:10-15.  However, as shown below, when a user enters a street address into such a database, the result is not just an image the target roof structure 501, but also of "adjacent buildings, trees, streets, and/or other features." *Id.*, 10:1-10.  Further, such databases often correlate the street address with the incorrect geographic location.  For example, in Figure 4B, the database-provided marker 106a corresponding to the street address "is close to roof structure 501, it does not directly or perfectly correspond to roof structure 501"—and is instead incorrectly positioned on the street near the roof structure 501.  *See id.*, 10:16-19, Fig. 4B.



1710 STRAND AVE., TYBEE ISLAND, GA. 31328

'800 Pat.,
Fig. 4B
(excerpt)

***This problem still exists today***.  For example, as shown below, a recent search for the same street address on Google Maps® demonstrates that the Google Maps-provided marker still "does not directly or perfectly correspond to the roof structure."  FAC ¶ 26.



The '800 Patent solves this problem by allowing a user to move a marker from the database-provided location to the correct location over the target roof in the digital aerial image, and to generate an accurate report with measurements of the roof. For example, claim 1 of the '800 Patent recites (1) receiving the first location data (*e.g.*, street address), (2) showing the user an image corresponding to the first location data, (3) providing a computer input for the user to designate a building roof structure location within the first image, (4) receiving the designation of the building roof structure, providing a second input for the user to signal acceptance of the building roof structure location, and (5) after the building roof structure location is confirmed, providing a report for the building roof structure. Claim 1 explicitly recites that "the building roof structure location is a geographic position of the building roof structure and is different than the first location data." That is, the first location data (*e.g.*, street address) may not accurately locate the roof. Only after determining the actual geographic position of the roof does the claimed invention provide the roof report, to ensure that it is for the correct roof. '800 Patent, 10:38-42 ("In this way, the end user/customer will be sure that when placing an order, the vendor is measuring the correct roof structure as opposed to, for example, measuring the nearby roof structure due to mistake/miscommunication.").

Translating the first location information (*e.g.*, street address) into the correct geographic position (*e.g.*, longitude and latitude) of the roof, as claimed, also enables the correlation of

multiple image databases.  For example, "a lower resolution and/or less expensive image database such as Google® Earth may be used as a first database, whereas a higher quality, higher resolution and/or more robust image database, such as by Pictometry International . . . may be used."  *Id.*, 11:1-8.  The use of geographic position also enables retrieving additional images and data relating to the roof in order to generate the roof report as claimed.  *Id.*, 11:15-35.  These innovations are further specified in dependent claims that recite, for example, providing visual access to outline drawings of the roof (Claim 2) and particular roof measurements (Claims 3-8).  In addition, Claim 10 more specifically recites that the first image is taken from an overhead view, as is common for large geo-coded image databases like Google Earth.  As discussed in Section IV.D, Roofr has not shown that Claim 1 is representative and so has not properly put these other claims at issue.

### 1.    The '800 Patent Is Not Directed To An Abstract Idea.

The '800 Patent claims a specific technique uniquely applicable to EagleView's new technology for obtaining roof measurements from images instead of the prior process of physically visiting and measuring the roof.  Thus, like the patents in *McRO* and *DDR*, the claims are not directed to an abstract idea.

In *McRO*, the patent claimed use of a computer to automate 3D animation, which previously was performed manually.  However, the claimed method did not merely "automate conventional activity[;]" instead, the claims recited an entirely different process to carry out the task of 3D animation.  837 F.3d at 1314-15.  In the same manner, EagleView's inventions do not simply automate the conventional way in which contractors would personally visit and climb onto a roof to measure it; instead, the claims recite aspects of an entirely different process—deriving roof measurements from images.  Further, like *McRO*, EagleView's claims "reflect[] a specific implementation" that does not preempt the field.  *Id.* at 1316.

The '800 Patent particularly addresses "a problem specifically arising in the realm of" remote, image-based roof measurements—the field that EagleView pioneered. *DDR*, 773 F.3d at 1257. A contractor given an address and physically conducting a site visit can readily tell where the roof is; indeed, he has to climb onto said roof and spend a considerable time making measurements. However, image-based roof measurement "introduce[d] a problem that does not arise in the 'brick and mortar' context," *i.e.*, the problem of utilizing incorrectly geo-coded images that do not accurately identify the roof from a given street address. *Id.* at 1258. The '800 Patent claims a specific solution to this problem. The challenge here—lack of extra information that is available when physically on-site—and need for a solution specific to the technological context is very similar to that in *DDR*, where the court compared how a customer in a physical warehouse store looking at a kiosk selling third-party vacation packages would still be inside the warehouse store, in contrast to customers being "completely transported" to another website upon clicking a hyperlink on the internet. *Id.* Like in *DDR*, the '800 Patent's focus on a challenge arising specifically in the technological context further shows that it is patent eligible. *See id.* at 1259.

Roofr impermissibly oversimplifies the '800 Patent claims into the alleged abstract idea of "selecting a roof from an image." In applying Section 101, "courts must be wary of 'describing the claims at such a high level of abstraction and untethered from the language of the claims' lest 'the exceptions to § 101 swallow the rule.'" *Blackbird Tech LLC v. Niantic, Inc.*, 2018 WL 5630452 (D. Del. Oct. 31, 2018) (quoting *Enfish*, 822 F.3d at 1337); *see also McRO*, 837 F.3d at 1315; *Diamond v. Diehr*, 450 U.S. 175, 189 n.12 (1981). Here, Roofr's mischaracterization ignores numerous specifics of the claims that tie them to the concrete technological improvement that EagleView developed, including: the image corresponds to first location data, the designation of the roof is used to determine a geographic position of the roof different than the first location

data, and the designation of the roof results in providing a report for the specified roof. Indeed, Roofr acknowledges that EagleView alleged in the FAC that the '800 Patent "invented a way to utilize low resolution imagery and/or incorrectly geocoded data to create highly reliable roof reports" and effectively concedes, if correct, this constitutes a patent-eligible claim. Roofr simply disputes the factual question of whether the '800 Patent discloses a "conventional user interface" to accomplish this goal. Mot. at 9. Even if the conventionality of the user interface is relevant to the Section 101 inquiry, it is a fact question and cannot be resolved at this stage of the proceedings.

Contrary to Roofr's arguments (Mot. at 8)—which misunderstand the invention and ignore various fact questions—EagleView's invention is unconventional. The '800 Patent overcomes the flaws in poorly geo-coded image databases, and uses images from such databases in a novel way to obtain roof measurements—without any in-person visits—and generate the roof report that previously had required so much more manual work. Similarly, Roofr's criticism about the lack of "any improved process for geocoding data or processing low-resolution images" is misplaced. *Id.* at 9. EagleView's invention did not fix such flawed third-party data, but rather worked around its limitations. *See, e.g.*, '800 Pat., 9:66-10:42, 11:1-31; FAC ¶ 26. And the '800 Patent claims do more than "access and display data" (Mot. at 10)—they are directed to a process that enabled use of data in an unconventional way.

Roofr's cited cases are inapposite. EagleView's patents are not about fundamental economic practices or a "purportedly new arrangement of generic information that assists traders in processing information more quickly," *Trading Techs. Int'l v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019), or broad commercial practices of using a computer to locate available real estate, *Move, Inc. v. Real Estate All. Ltd.*, 721 F. App'x 950, 955 (Fed. Cir. 2018). Nor, as already explained, do EagleView's patents "merely contemplate[] automation using a computer," *Int'l*

*Bus. Machines Corp. v. Zillow Grp., Inc.*, 549 F. Supp. 3d 1247, 1267 (W.D. Wash. 2021), or merely "creat[e] a computer-readable file to store information." *CertusView Techs., LLC  v. S&N Locating Servs. LLC*, 111 F. Supp. 3d 688, 722 (E.D. Va. 2015).  Moreover, the Federal Circuit has cautioned that "[w]hile prior cases can be helpful in analyzing eligibility, whether particular claim limitations are abstract or, as an ordered combination, involve an inventive concept that transforms the claim into patent eligible subject matter, must be decided on a case-by-case basis in light of the particular claim limitations, patent specification, and invention at issue." *CosmoKey Sol'ns GmbH & Co. KG v. Duo Sec. LLC*, 15 F.4th 1091, 1099 (Fed. Cir. 2021).  The record here shows EagleView's patents are non-abstract and inventive.

### 2.    The '800 Patent Recites An Inventive Concept.

Because the claims are not directed to an abstract idea, the Court need not reach *Alice* Step Two.  Nonetheless, the Step Two analysis confirms the '800 Patent is patent eligible.  As explained above, the ordered combination of elements achieved an unconventional—and indeed, breakthrough—result: accurate roof measurements obtained from imagery instead of manual site visits, that overcame the limitations of poorly geo-coded image databases that may not even accurately identify the location of the building, much less the roof.  Contrary to Roofr's argument, these inventive concepts are reflected in the claims, including in the steps of (1) receiving first location data and displaying a corresponding image that includes a roof (distinguishing the claims from conventional physical site visits) and (2) receiving a designation of a geographic position of the roof that is different than the first location data (*e.g.*, the incorrectly geo-coded street address).  The innovative character of EagleView's inventions has been repeatedly tested and upheld.  For example, after reviewing the trial evidence, Judge Bumb noted that she would have found the claims in *Xactware* "recite an inventive concept" under *Alice* Step Two because "EagleView's

14

inventions were nowhere close to resembling the practice of climbing on rooftops with tape measures in hand" and instead were "groundbreaking." *Xactware II*, 485 F. Supp. 3d at 518 n.9.

In addition, Roofr's Step Two analysis is rife with fact questions that cannot be resolved at the pleading stage. *Berkheimer*, 881 F.3d at 1367-68; *Aatrix*, 882 F.3d at 1125. The pleaded facts show that EagleView's inventions were revolutionary and not at all "well-understood, routine, [or] conventional," *Alice*, 573 U.S. at 225. FAC ¶¶ 17-26. For example, Roofr asserts that the elements of the '800 Patent as an ordered combination are conventional—directly contradicting the FAC allegations. *See* Mot. at 12-13; FAC ¶ 26. Accordingly, Roofr's motion as to the '800 Patent should be denied.

**B.      The '538 Patent Claims Eligible Subject Matter**

The '538 Patent, which post-dates *Alice* and overcame a Section 101 rejection during prosecution, claims a novel solution for simplifying the estimation of roofing area. Like EagleView's other patents, the solution is necessarily rooted in computer technology because it is specific to the field of digital imagery analysis for roof measuring. *See, e.g.*, *McRO*, 837 F.3d at 1316; *DDR*, 773 F.3d at 1258-59. Specifically, the '538 Patent claims the specific technique of using the roof's "predominant pitch" and footprint, obtained by analyzing images of the roof, to estimate roofing area. *See, e.g.*, '538 Pat., 11:55-12:47; FAC ¶ 24.

There are multiple ways to calculate or estimate roofing area, even within the field of image-based roof measurements—one approach was to trace the outline of every facet of the target roof and then calculate the pitch of each facet. FAC ¶ 24.[6] The '538 Patent claims a different, novel and simpler way to perform this estimate: instead of using the precise pitch of each facet,

---

[6] This approach was also noted during prosecution of the '538 Patent. *See* Request for Continued Examination at 17-18 (USPTO May 27, 2015) (Ex. B).

the claims recite using the roof's "predominant pitch," the calculation of which is disclosed in the specification, together with the footprint (*i.e.*, overall boundary) of the roof.  This approach was not found in the prior art.  *See CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1370-71 (Fed. Cir. 2020) (finding district court made "the incorrect assumption that the claims are directed to automating known techniques" when nothing in the record supported "that doctors long used the claimed diagnostic processes").

Other claims recite additional innovations, including (1) distributing the process across two host systems, each of which can be segregated and perform different functions per the specification (Claims 4 and 13); (2) "validat[ing] the geographic location of the roof" (Claims 6-7)—reflecting an approach similar to the '800 Patent; (3) a specific analysis of roof edges using "multiple oblique images from multiple cardinal directions" (Claim 9); and (4) more specific methods of computing the "predominant pitch" (Claims 10-11, and 18).  As discussed in Section IV.D, Roofr has not shown that Claim 1 is representative and so has not properly put these other claims at issue.

### 1. The '538 Patent Is Not Directed To An Abstract Idea

Roofr oversimplifies the claims of the '538 Patent into the alleged abstract idea of "estimating a roofing area using an image of a roof."  Mot. at 14.  But, again, *only* using images to make such measurements was not a conventional approach, notwithstanding Roofr's unsupported assertion.  Even if some version of the concept of using images was known, or even had been tried before, it was EagleView's specific technological solution, not the idea by itself, that achieved wide-scale industry adoption and offered a viable alternative to climbing onto a roof—which materially saved time and increased accuracy, and entirely reduced physical risk.  *See* '538 Pat., 1:26-34 (noting prior use of images to measure objects but stating the invention offers the benefit of "increase[d] speed" and "reduc[ing] labor and fuel costs associated with on-site visits").  Under *McRO*, the specific claimed techniques are not "carried out in the same way" as prior manual

16

methods and are patent eligible.  837 F.3d at 1314.  In addition, the '538 Patent does not preempt all ways of estimating roofing area using an image.  *See id.* at 1316.

Roofr argues that EagleView's patents simply "tak[e] a traditional site visit" and "do[] it on a computer," but similar mischaracterizations have been repeatedly rejected by the courts.  *E.g.*, *Xactware I*, 358 F. Supp. 2d at 406, 409 (rejecting argument that "the recited method is just a computerized routine of what a human could do without the software and adds nothing to solving the problem of creating a roof estimate report but a computer"); *Xactware II*, 485 F. Supp. 3d at 516, 518-19 (rejecting argument that EagleView's patents "disclose nothing more than 'putting a roofer on a roof' with a tape measure which measurements are then inputted into a computer from which a report is generated").  Moreover, as discussed above, a "traditional" site visit did not involve determining or using "predominant pitch."[7]

At the very least, Roofr's arguments that the '538 Patent simply applies "known prior art techniques" or is too broad in claiming "*any* method of computing a predominant pitch" (Mot. at 15-16) raise factual issues that doom Roofr's motion.  Roofr presents no evidence that using "predominant pitch" was a known technique, let alone that the specifically-claimed implementations of predominant pitch were known, such as basing its value "on a weighted average of individual pitch factors for two or more portions of the roof" (Claim 18); indeed, it would be inappropriate for such evidence to be weighed on a Rule 12(b)(6) motion.

Roofr's argument that the '538 Patent is mere "data analysis" is similarly misplaced in light of the novelty of EagleView's "predominant pitch" approach.  For example, unlike the claims in *Elec. Power Grp., LLC v. Alstom S.A.*, which "do not even require a new source or type of

---

[7] Other claims recite additional computerized requirements, like validating the geographic location of a roof (Claims 6-7), which also do not fit Roofr's mischaracterization of the '538 Patent as mere implementation of a traditional site visit on a computer.

information, or new techniques for analyzing it," EagleView's claims *do* require an "inventive set of components or methods, such as measurement devices or techniques, that . . . generate new data."  830 F.3d 1350, 1355 (Fed. Cir. 2016); *see also TaKaDu Ltd. v. Innovyze, Inc.*, No. 21-291-RGA, U.S. Dist. LEXIS 40614, at *13 (D. Del. Mar. 8, 2022) (upholding patents that "teach particular ways of achieving data analysis").

Roofr's attempts to trivialize the invention (Mot. at 16) should be rejected.  *First*, the mere fact that a claim incorporates a mathematical concept or formula does not render it unpatentably abstract.  *See, e.g.*, *Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) ("That a mathematical equation is required to complete the claimed method and system does not doom the claims to abstraction."); *Diehr*, 450 U.S. at 192 ("[W]hen a claim containing a mathematical formula implements or applies that formula in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect . . . , then the claim satisfies the requirements of § 101.").  *Second*, an objective of providing greater simplicity, rather than complexity, can render claims non-abstract.  *See CosmoKey*, 15 F.4th at 1099 ("[T]he claims recite an inventive concept by requiring a specific set of ordered steps that . . . improve upon the prior art by providing a *simple method* that yields higher security." (emphasis added)).  Thus, it does Roofr no good to dismiss the "predominant pitch" approach merely because is supposedly "simpler" than prior techniques.

## 2.     The '538 Patent Recites An Inventive Concept

As discussed, the claims are not directed to the abstract idea of estimating a roofing area using an image of a roof but rather a specific way of estimating an area of a roof that constitutes an improvement to the field of image-based roof estimation.  Even if the claims were directed to an abstract idea, which they are not, the improvement and the particular steps recited in the claims supply an inventive concept that renders the claims patent eligible at *Alice* Step Two.  *CosmoKey*

is instructive: there the Federal Circuit skipped directly to Step Two and found that the claimed "simple method," which "departs from earlier approaches to solve a specific computer problem," contained an inventive concept. *Id.* at 1097-10998. The '538 Patent similarly departed from earlier approaches of tracing every roof facet and claims the faster, simpler approach of using "predominant pitch" and a footprint of the roof to produce an estimate. FAC ¶ 24. Those facts also make this case distinguishable from *Electric Power*: the '538 Patent does not merely "limit[] the claims to [a] particular technological environment;" they recite a novel technique for analyzing roof images. 830 F.3d at 1354-55; *see also CardioNet*, 955 F.3d at 1370 (upholding claims for a specific method of improved cardiac monitoring using a new diagnostic technique).

At Step Two, Roofr cites yet a different alleged abstract idea—"using a predominant pitch algorithm" (Mot. at 19)—but fails to show that it is abstract at all. Again, the claimed use of "predominant pitch" cannot be found abstract without prematurely resolving factual questions, such as the novelty of using "predominant pitch,." let alone of using "predominant pitch" *in combination with* the footprint of the roof. Thus, the motion as to the '538 Patent should be denied.

## C.    The '840 Patent Claims Eligible Subject Matter

The '840 Patent is directed to an improved computer system for generating a roof estimate report through iterative user manipulation of an interactive graphical interface tool that is overlaid on aerial roof images, allowing a user to more accurately and reliably make iterative adjustments to a computer-generated 3D model of a roof and output a tangible, improved roof analysis. The claims include specific and concrete requirements that render them non-abstract, including the use of a "pitch determination marker" that is "overlaid on the aerial image" of a roof, the model of the roof being modified "based on the received indication of the pitch of the one planar roof section," all of which is used to generate a roof estimate report. '840 Pat., Cl. 1. Roofr addresses only Claim 1, but, as discussed below, has not shown it is representative.

### 1.    The '840 Patent Is Not Directed To An Abstract Idea

The '840 Patent reflects a specific technical solution in which the modification of a roof model is achieved in a specific way: the claimed pitch determination marker "can be directly manipulated by the operator in order to specify the pitch of a section of the building roof" (*id.*, 12:45-48), after which "the roof estimation system determines the pitch of the roof section, based on the configuration of the marker . . . with respect to the image and the reference grid (*id.*, 12:57-62). In doing so, "the operator obtains feedback regarding the correctness and/or accuracy of the 3D model or other aspects of the model generation process, such as image registration and pitch determination." *Id.*, 14:41-46. The Federal Circuit has repeatedly found specific technical solutions to technical problems, like here, are non-abstract. *See, e.g.*, *Bascom*, 827 F.3d at 1350 ("technical improvement over prior art"); *Core Wireless Licensing S.A.R.L. v. LG Elecs., Inc.*, 880 F.3d 1356, 1363 (Fed. Cir. 2018) (claims "recite a specific improvement over prior systems"). Far from merely automating human behavior, the '840 Patent replaces the need to climb up on a roof to determine pitch, thus improving computer technology in a specific, non-preemptive way to allow for accurate roof measurements using aerial imagery.

As noted, the '840 Patent has already survived three successive Section 101 challenges in the *Xactware* case. Roofr, however, ignores that history and merely argues this case is "not comparable" because the other two patents have never been asserted before. Mot. at 3. That makes no sense. The patentability of the '840 Patent does not depend on what other patents it is asserted with. The '840 Patent was litigated through trial, where it was found valid and infringed, and the district court three times rejected the argument that it was unpatentable under Section 101—at the

pleadings stage, on summary judgment, and post-trial, on a full record. Revisiting the patent eligibility of the '840 Patent at this point is nothing more than a waste of judicial resources.[8]

None of Roofr's arguments are new. For example, Roofr describes the invention as "simply a software-based alternative to physical site visits" (Mot. at 20), but, as the New Jersey court observed, "EagleView's inventions were nowhere close to resembling the practice of climbing on rooftops with tape measures in hand. EagleView's inventions were groundbreaking, and no one disputed that until this litigation." *Xactware II*, 485 F. Supp. 3d at 518 n.9. Moreover, the fact that EagleView's inventions are a computerized "alternative"—to borrow Roofr's term— rather than a computer replication of the human task, actually confirms their patent eligibility. *See, e.g.*, *McRO*, 837 F.3d at 1314 (finding claims patent eligible where "[t]he computer . . . is employed to perform a distinct process to automate a task previously performed by humans"). Roofr's argument that the claimed advance is "nothing more than displaying a virtual protractor" misses the point because the prior manual method of climbing on a roof did not involve laying a protractor on an aerial image of a roof. *See id.* (finding the prior art method, "even if automated by rules, would not be within the scope of the claims"). Like *McRO*, this case is "unlike *Flook*, *Bilski*, and *Alice*, where the claimed computer-automated process and the prior method were carried out in the same way." *Id.*

Roofr's cited cases purportedly relating to "user interfaces for displaying conventional information" (Mot. at 22) are just as inapposite to the '840 Patent as they are to the '800 Patent, as explained above. *See supra* Section VI.A.1.

---

[8] Nonetheless, yet another Section 101 challenge to the '840 Patent is currently pending in *Eagle View Technologies, Inc. v. GAF Materials, LLC*, Case No. 2:22-cv-00215 (D. Utah).

### 2.     The '840 Patent Recites An Inventive Concept

Because the claims are not directed to an abstract idea, the Court need not reach *Alice* Step Two, just as Judge Kugler and Judge Bumb found it unnecessary to do so.  Nonetheless, the record is clear that the claim elements—including the iterative use of a pitch determination marker—are more than well-understood, routine, or conventional activity and that they are specific and concrete—precisely the type of particularized claim elements that are regularly found to qualify as *Alice* Step Two "inventive concepts."

Again, as set forth in the patent specifications and the FAC, prior to EagleView's invention, roofing contractors preparing a roof repair or replacement estimate for homeowners were forced to physically visit a house and climb on the roof to take measurements.  EagleView's inventions, as captured by the claims of the asserted patents, established an entirely new alternative to manual measurements by accurate roof reports in hours that were widely praised by both the public and EagleView's own competitors as "innovative" and a "breakthrough" never before seen in the industry.  FAC ¶¶ 17-21.  Indeed, Judge Bumb noted that she would have found the claims "recite an inventive concept" because "EagleView's inventions were nowhere close to resembling the practice of climbing on rooftops with tape measures in hand" and instead were "groundbreaking." *Xactware II*, 485 F. Supp. 3d at 518 n.9.  Roofr's conclusory assertions to the contrary (Mot. at 23-24) could not be more wrong.

Roofr has not come close to meeting its burden at *Alice* Step Two, or at any point in the Section 101 analysis, and its motion as to the '840 Patent should be denied.

### D.     Roofr Has Not Met Its Burden To Show The Claims Are Representative

Roofr's conclusory arguments with respect to the dependent claims (Mot. at 24-25) are insufficient to support a finding that the dependent claims are patent ineligible.  As an initial matter, it is Roofr's burden to show that its challenged claims are representative. *See Pragmatus*, 114 F.

Supp. 3d at 199-200 (faulting defendants for "merely . . . say[ing]" claims are representative without providing "additional analysis").[9]  But Roofr merely dismisses the dependent claims as "narrow[ing] the abstract ideas" without introducing any inventive concepts (Mot. at 25).  Not so.

As one example, Claim 10 of the '800 Patent specifies that the first image, which is displayed based on the provided street address, for example, is an overhead view.  As discussed above, the system of the '800 Patent enabled correlating lower-resolution, incorrectly geo-coded image databases like Google Earth, which provide overhead view satellite imagery, with other images that enable more accurate analysis.  Claims 2-9 of the '800 Patent also specify that, once the actual roof location is specified (as opposed to the approximate location of a street address), the invention can provide an outline drawing corresponding to the actual roof and even overlay it on the satellite image (Claim 9).  These dependent claims thus specify additional, specific features tied to inventive concepts described in the specification.  Roofr has not shown that they can simply be lumped into its analysis of Claim 1 (which is also deficient).

As another example, dependent claims of the '840 Patent recite further specific, concrete, non-abstract innovations such as a "pitch determination marker" with "a member that is adjustable to indicate an angle" (Claim 7) or "an envelope tool having two surfaces that are adjustable to indicate an angle" (Claim 8).  These innovations enhance the function of the "pitch determination marker," which is "overlaid on the aerial image of the building having the roof" as recited in Claim 1.  *See, e.g.*, '840 Pat., Figs. 5B (showing pitch determination marker with adjustable arm 510d), 5C-5D (showing use of envelope tool).

---

[9] Nor is it proper for Roofr to ignore the rest of a patent merely because EagleView did not identify more claims in the FAC.  *See Promos Techs., Inc. v. Samsung Elecs. Co. Ltd.*, No. 18-307-RGA, 2018 WL 5630585 (D. Del. Oct. 31, 2018) ("[T]he use of exemplary pleading of claims is sufficient to satisfy Rule 12(b)(6).").

The independent claims in each patent are also distinct from one another.  For example, Claim 13 of the '538 Patent recites that the "predominant pitch" and other elements previously discussed are split between at least two host systems.  The first host system determines the geographic location of the roof and identifies nearby contractors, while the second host system performs the analysis of the roof images and generates a roof report.  '538 Pat., Cl. 13.  The patent explains that "the first host system 102 may direct customers to the second host system 126" so that "only the second host system 126 provides geo-referenced images in the image database 141." *Id.*, 10:5-15.  As the Federal Circuit has held, "an inventive concept can be found in the non-conventional and non-generic arrangement of known, conventional pieces."  *Bascom*, 827 F.3d at 1350.  Here, the pieces themselves were also novel, and the arrangement of elements across two host systems supplies an additional inventive concept.

Thus, Roofr has not presented a basis to rule on the patentability of any claims other than Claim 1 of each asserted patent.

### E.   Roofr's Motion Is Also Premature

As explained, Roofr's motion fails on the merits as to each Asserted Patent.  However, this Court can also reject Roofr's challenge as premature without reaching the merits.  Roofr's arguments impermissibly contradict the factual allegations of the FAC, as described above.  The history of acclaim for EagleView's technology is strong evidence that the inventions were non-abstract, concrete improvements to technological processes and embodied inventive concepts that revolutionized the industry.  *See* FAC ¶¶ 17-26.  Those allegations, read in EagleView's favor as they must be, establish that the claims are patent eligible.  *Aatrix*, 882 F.3d at 1125.

For example, Roofr's argument that using images to measure a roof "was already common as of the '538 patent" (Mot. at 14) proves EagleView's point.  *First*, calling the practice "common" is an unsupported, and disputed, factual assertion by Roofr that should be given no weight.  *Second*,

Roofr creates another factual dispute in asserting that the '538 Patent "merely implements these known techniques in software" (Mot. at 15)—there is no evidence that the claimed technique, including use of "predominant pitch," was known in the prior art.  Indeed, the fact that the '538 Patent claims were allowed, with a specification containing the language that Roofr cites, confirms that the claims are different from prior approaches.  *Third*, whatever image-based techniques were previously known, it does not change EagleView's enormous impact on the industry; if anything, it supports EagleView's position that the patented technology was not just an abstract idea but specific technological improvements, which the industry recognized.  *See* FAC ¶¶ 17-26.

EagleView is confident that the resolution of these factual issues later in litigation will bear out the patentability of its inventions, but at a minimum it is clear that Roofr cannot prevail on its Section 101 challenge until those questions are resolved.

## VII.   CONCLUSION

For the foregoing reasons, EagleView respectfully requests that Roofr's motion to dismiss be denied in its entirety.

|  | */s/ Nathan R. Hoeschen* |
|---|---|
| OF COUNSEL: | Karen E. Keller (No. 4489) |
| L. Kieran Kieckhefer | Andrew E. Russell (No. 5382) |
| SHEARMAN & STERLING LLP | Nathan R. Hoeschen (No. 6232) |
| 535 Mission Street, 25th Floor | SHAW KELLER LLP |
| San Francisco, CA 94105 | I.M. Pei Building |
| (415) 616-1100 | 1105 North Market Street, 12th Floor |
|  | Wilmington, DE 19801 |
| Matthew G. Berkowitz | (302) 298-0700 |
| Patrick Colsher | kkeller@shawkeller.com |
| Yue (Joy) Wang | arussell@shawkeller.com |
| SHEARMAN & STERLING LLP | nhoeschen@shawkeller.com |
| 1460 El Camino Real, 2nd Floor | *Attorneys for Plaintiffs Eagle View* |
| Menlo Park, CA 94025 | *Technologies, Inc. and Pictometry* |
| (650) 838-3600 | *International Corp.* |

Dated: May 27, 2022